IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

BRIDGE PREMIUM FINANCE, LLC (F/K/A
BERJAC OF COLORADO, LLC),
MICHAEL J. TURNOCK, and
WILLIAM P. SULLIVAN, II,

Defendants.

---

## COMPLAINT

---

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges as follows against Defendants Bridge Premium Finance, LLC (f/k/a Berjac of Colorado, LLC) ("BPF"), Michael J. Turnock ("Turnock") and William P. Sullivan, II ("Sullivan") (collectively, "Defendants"):

### I.      SUMMARY OF THE ACTION

1.      This SEC enforcement action concerns an ongoing Ponzi scheme being conducted by BPF, its principal, Turnock, and chief financial officer ("CFO"), Sullivan.

2.      From approximately 1996 through present, BPF raised at least $15.7 million from more than 120 investors in multiple states through an unregistered offering

of promissory notes. During the relevant period, Defendants raised money from promissory note investors purportedly to provide capital for BPF's insurance premium financing business – that is, making short-term loans to businesses to enable them to pay their annual commercial insurance premiums. Defendants portrayed the promissory note investments as safe, conservative investments comparable to money market accounts and certificates of deposit, but offering higher rates of interest, up to 12 percent annually. BPF purportedly earned enough interest on its premium financing loans to its clients in order to pay the rates of interest it promised to its promissory note investors.

3.     Turnock and Sullivan repeatedly told investors that BPF's premium loan business was performing well, and that it could use additional funds to make more insurance premium financing loans. Turnock and Sullivan also assured investors that their funds were "100% Protected" because, among other things, BPF's premium financing loans were 100% collateralized.

4.      In reality, from at least 2002, BPF has operated as a Ponzi scheme. Since that time, BPF has not earned sufficient returns from its insurance premium financing business from which to pay interest and redemptions to its investors. Instead, BPF has paid quarterly interest payments and redemptions to existing investors with money raised from other investors.

5.     In addition, Defendants' claims that BPF's promissory note investments were "100% protected" were false. Because BPF used the vast majority of investors' funds to make Ponzi payments to other investors, BPF's insurance premium loan portfolio (and any collateral applicable to the underlying insurance policies) never

provided nearly enough collateral to protect investor funds.  Currently, BPF's insurance premium loan portfolio totals only about 4% of the amount that BPF owes to its promissory note investors.

6.      Throughout the relevant period, BPF's outstanding liabilities to its promissory note investors have steadily increased while its assets have steadily decreased.  After more than a decade of Ponzi payments and operational losses, by May 2012, BPF owed investors more than $6.2 million, yet its insurance premium loan portfolio totaled less than $250,000, and it had total assets of less than $500,000.

7.      As a result of the conduct alleged in this Complaint, BPF and Turnock engaged in a scheme to defraud BPF investors by, among other things, making misleading statements and omissions about the use of investor proceeds, BPF's financial performance and condition, and the safety and security of the promissory note investments; by using investor proceeds to make Ponzi-like payments to other investors; and by providing fraudulent account statements to investors that reflected account balances that BPF could not pay.  In or about February 2011, Sullivan joined the scheme to defraud and fully participated in it.

8.      During the period at issue, Turnock and Sullivan concealed BPF's abysmal financial performance and condition from new and existing promissory note investors.  They hid from investors BPF's perennial losses, and the ever widening gap between amounts BPF owed to its investors and its total assets.

9.      Turnock and Sullivan have continued to solicit investor funds as recently as last month.  Currently, BPF is short approximately $5.8 million in investor funds and

the Defendants may be further dissipating investor funds at this time.  On or about July 20, 2012, in a telephone call with one investor, Sullivan candidly admitted, "Your money is all gone. This is a Ponzi scheme."

## II.    SUMMARY OF VIOLATIONS

10.    As a result of the conduct described herein, BPF and Turnock offered and sold unregistered securities, obtained money or property on the basis of misleading statements and omissions, and made misleading statements and omissions.  Accordingly, BPF and Turnock have violated, and unless restrained and enjoined, will continue to violate Sections 5(a), 5(c), and 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

11.    As a result of the conduct described herein, BPF, Turnock and Sullivan engaged in a scheme to defraud and have violated and unless restrained and enjoined will continue to violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

12.    In the alternative, as a result of the conduct described herein, Turnock is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t] for BPF's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

13.     In the alternative, as a result of the conduct described herein, Sullivan aided and abetted, and unless restrained and enjoined, will continue to aid and abet Turnock's and BPF's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.     JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to restrain and enjoin the Defendants from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.  The Commission seeks permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus pre-judgment and post-judgment interest thereon, and third-tier penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

15.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce.

16.     Venue lies in this Court pursuant to 15 U.S.C. §§ 77u(a) and 78aa and 28 U.S.C. § 1391(b)(2).  Defendant BPF is a Colorado limited liability company and

maintains its principal place of business in Denver, Colorado.  Defendant Turnock resides

in Denver, Colorado, and Defendant Sullivan resides in Highlands Ranch, Colorado.  In

addition, many of the acts and practices described in this Complaint occurred in the

District of Colorado.

## IV.     DEFENDANTS

17.     **Bridge Premium Finance, LLC (f/k/a Berjac of Colorado, LLC)**, is a

Colorado limited liability company with its principal place of business in Denver,

Colorado.  BPF was formerly known as Berjac of Colorado, LLC, until approximately

September 2005.  BPF purports to be in the business of pooling investor funds to make

insurance premium financing loans.  Turnock is BPF's sole owner and managing

member.  BPF has not registered any class of securities or securities offerings with the

SEC.

18.     **Michael J. Turnock**, age 68, is a resident of Denver, Colorado.  He is the

sole and managing member of BPF.  Turnock refused to testify in the SEC's

investigation, citing his Fifth Amendment privilege against self-incrimination in response

to all substantive questions.

19.     **William P. Sullivan, II**, age 45, is a resident of Highlands Ranch,

Colorado.  He served as CFO of BPF from approximately February 2011 through July

2011.  From August 2011 through the present, Sullivan has remained the *de facto* CFO of

BPF by virtue of his position as CFO of Delphi Companies, LLC, which functions as an

operational holding company for BPF and other entities owned by Turnock.  Sullivan has

a criminal record that includes three felony convictions; including one for forgery and

two for theft.  Sullivan refused to testify in the SEC's investigation, citing his Fifth

Amendment privilege against self-incrimination in response to all substantive questions.

**V.  FACTS**

**A.  BPF's Purported Insurance Premium Financing Business**

20.  In approximately 1996, Turnock purchased a majority interest in and

became the managing member of Berjac of Colorado, LLC ("Berjac").  Turnock

purchased the remainder of Berjac from its prior owners in approximately December

2004, and he continued Berjac's operations as its sole owner and managing member.

21.  In approximately September 2005, Turnock changed Berjac's name to

Bridge Premium Finance, LLC.  The operations of Berjac and BPF will be collectively

referred to as "BPF."

22.  Turnock is currently BPF's sole owner and managing member.  From

1996 through the present, he has controlled BPF's day-to-day operations, policies and

practices.

23.  Sullivan has served as BPF's CFO or *de facto* CFO from approximately

February 2011 through the present.  In that capacity, Sullivan has had primary

responsibility for, among other things, tracking all investments in BPF through its

"noteholder" program, maintaining BPF's financial records, preparing BPF's financial

statements, and preparing and sending quarterly account statements to investors.

24.  BPF purports to be in the business of insurance premium financing, which

is making short-term loans to small businesses to enable them to pay their up-front,

annual, commercial insurance premiums.  As described by the Defendants, in a typical

7

BPF insurance premium financing transaction:  (i) BPF's clients pay about 25% of their insurance premium up-front; (ii) BPF pays the remaining 75% of the policy premium directly to the insurance company, but retains the power to cancel the policy and receive any unearned premium due upon cancellation; (iii) the client re-pays BPF the 75% of the premium that BPF financed, plus interest, in monthly installments, usually over eight or nine months; and (iv) if the client fails to make monthly installment loan payments due, BPF retains the right to cancel the policy and receive the unearned premium refund directly from the insurance company.

**B.      BPF's Promissory Note Offering**

25.      From approximately 1996 through the present, BPF has raised capital purportedly to make insurance premium financing loans by continuously offering and selling promissory notes to investors.  The promissory notes were called "Berjac Notes" from approximately 1996 through September 2005 and "Bridge Notes" from September 2005 through the present.

26.      Turnock had primary responsibility for conducting BPF's promissory note offering.  On behalf of BPF, Turnock provided prospective investors with various versions of a two- to four-page offering brochure, which contained a general description of BPF's purported insurance premium financing business, and instructions on how to invest.

27.      Before or after sending the BPF brochure, Turnock typically met in person with or had telephone conversations with prospective investors.

28.    BPF obtained some new investors based upon referrals from existing investors.  Throughout its promissory note offering, BPF employed various investor referral reward programs.  For example, in one recent program, existing investors received .5% each year of any outstanding promissory note balance maintained by other investors that they referred to BPF.

29.    Following receipt of investors' funds, Turnock signed a one-page BPF promissory note with an open-ended term.  Berjac or BPF was the maker of the promissory notes, and Turnock executed them in his capacity as the "Manager" or "Managing Partner" of Berjac or BPF.

30.    BPF issued initial promissory notes in amounts of up to $500,000.  BPF's promissory notes feature above-market annual interest rates ranging from 3.25% to 12%. Turnock set interest rates approximately once each quarter on a graduated scale, depending upon the total investment amount or other factors depending on the particular investment.

31.    BPF investors had the option of receiving their interest in a quarterly check, or having their interest reinvested, and paid to them at the redemption of the promissory note.  The majority of investors reinvested their interest rather than receiving quarterly interest payments.

32.    According to their terms, BPF promissory notes are due immediately upon demand by investors.  Turnock touted this supposed liquidity as a key benefit of the BPF promissory notes.

33.    At Turnock's request, some investors also agreed to so-called "lock letters" wherein, in exchange for an annual interest rate increase of approximately .25 to 3 percent, investors agreed not to withdraw their funds from BPF for a set time, typically twelve to eighteen months.  Turnock signed letters or sent emails confirming the terms of the lock letters, but he did not create a modified BPF promissory note.

34.    In 2012, Turnock enticed some of BPF's largest investors to extend the terms of their promissory notes by offering annual interest rates of up to 12%.

35.    Following their initial promissory note investment, BPF mailed investors quarterly account statements.  During his employment, Sullivan was responsible for maintaining BPF's program tracking all promissory note investors, and for generating and sending the quarterly statements to investors.

36.    Although the promissory notes set an initial annual interest rate, BPF could adjust interest rates up or down quarterly by notifying investors of rate changes in their quarterly statements.  BPF periodically adjusted its interest rates in this manner, comparing its rates to conservative investments, such as bank certificates of deposit and money market accounts.

37.    BPF did not issue new promissory notes reflecting periodic interest rate changes, additional investments, or redemptions.  Instead, BPF documented additional investments by issuing a receipt of deposit, and then reflecting amounts deposited or withdrawn on the investor's subsequent quarterly account statements.

38.    From approximately 1996 through June 2012, BPF raised more than $15.7 million from more than 120 investors located in Colorado, and at least eleven other states.

**C.     Defendants BPF and Turnock Made False, Fraudulent, and Material Misrepresentations and Omissions in Connection with Their Offer and Sale of BPF Promissory Notes**

39.     In raising funds from investors and in convincing investors to continue to invest, BPF and Turnock made numerous written and oral material misrepresentations and omissions regarding the use of investor proceeds, BPF's financial performance and condition, and the safety and security of the promissory note investments.

**i.   Material Misrepresentations and Omissions Regarding BPF's Use of Proceeds and Ponzi Payments**

40.     BPF and Turnock made material misrepresentations and omissions regarding BPF's use of investor proceeds to make Ponzi payments to other investors.

41.     Between 1996 and the present, Turnock sent or caused to be sent various versions of a two- to-four page offering brochure to prospective investors.

42.     Although BPF's offering brochure has undergone numerous iterations, each of them described that BPF used investors' funds to make insurance premium financing loans.  For example, versions of the offering brochure from approximately 1999 through 2002 stated in relevant part:

> Who is Berjac?
>
> Because commercial insurance companies frequently require businesses to pay 100% of their annual insurance premiums in advance, many companies elect to finance the annual amount to preserve cash flow. That's where Berjac comes in.  We are a provider of insurance "premium financing" – a short-term loan system that enables companies to finance their annual commercial insurance premium, and pay on a monthly, or quarterly basis.
>
> Berjac obtains primary funds for these loans through bank lines of credit and the capital of the principals.  We also offer individuals and companies

the opportunity to deposit funds with Berjac on a guaranteed promissory note basis.

43.    Throughout BPF's promissory note offering, in numerous on-on-one meetings with investors and telephone conversations, Turnock orally repeated the same description of BPF's business as was contained in the offering brochures.  For example, as recently as May 2012 in a meeting with investors at BPF's offices:

   a.    In response to an investor question, Turnock flatly denied that BPF was a Ponzi scheme;

   b.    Turnock provided a detailed description of BPF's insurance premium financing business, and how it purportedly generated income to pay BPF investors;

   c.    Turnock stated that BPF "had more business than cash;"

   d.    Turnock told investors that BPF's interest rates to its investors were going up because BPF was making money; and

   e.    Turnock claimed that BPF could pay annual interest rates as high as 12% because it received annual interest rates exceeding 30% from its insurance premium borrowers.

44.    In all written information provided to investors and oral conversations during the promissory notes offering, BPF and Turnock have omitted the material information that BPF was functioning as a Ponzi scheme, including that:

   a.    BPF's insurance premium financing business had failed to generate sufficient returns from which to pay interest and redemptions to investors;

b.  From 1998 through May 2012, BPF generated less than $2.5 million in revenue from its insurance premium financing business, but paid investors more than $12.3 million in purported interest and redemptions; and

c.  From approximately January 2011 through at least May 2012, BPF's insurance premium financing business had not generated any positive revenue with which to pay interest and redemptions to investors.

45.     Each of the representations and omissions to investors regarding BPF's insurance premium financing business and use of investor proceeds was false and misleading because, since at least 2002 through the present, BPF has used investor funds to make Ponzi payments to other investors.  Due to BPF's deteriorating financial performance and condition, it has relied on using investor funds to meet investor redemptions and interest payments.

46.     BPF's misrepresentations and omissions as to use of proceeds were material to investors because the investors believed that their funds were being used to make insurance premium financing loans, not to make Ponzi payments to other investors.

47.      BPF and Turnock each knew or were reckless in not knowing that the misrepresentations and omissions to investors described herein regarding BPF's use of investor proceeds were materially false and misleading.

**ii.  Material Misrepresentations and Omissions Regarding BPF's Poor Financial Performance and Condition**

48.     Throughout the promissory notes offering, BPF and Turnock raised funds from investors by misrepresenting BPF as a thriving and profitable business that sought additional investor funds to make more premium financing loans.

49.     BPF and Turnock did not provide investors with BPF's financial

statements.  However, some versions of the BPF offering brochures touted BPF's

financial performance.  For example, a version of the offering brochure from

approximately 2001 stated in relevant part:

> MARKETS MAY BE DOWN, BUT BERJAC IS EXPERIENCING A
> STRONG UP MARKET, WITH CONSECUTIVE RECORD YEARS!
>
> • 1999 – Up 17%
>
> • 2000 – Up 27%
>
> • 2001 Up 101% (PARTIAL YR.)"
>
> . . .
>
> Berjac has been successfully providing premium financing for 38 years . .
> .

50.     These representations to investors regarding BPF's increased sales were

false and misleading because, although BPF may have increased its sales of insurance

premium financing loans from 1999 through 2001, it still was not profitable in those

years.  In fact, BPF lost $48,938, $65,128, and $40,277 respectively, in 1999, 2000, and

2001.

51.     Turnock continued to tout BPF's financial performance throughout the

promissory note offering.  For example, in April 2011, Turnock signed and disseminated

a BPF investor update that claimed in relevant part:

> Because our loan volume is growing again we anticipate that our need for
> funding will also increase.  Our source of funding has historically been
> referrals from our current noteholders.  We are now in a position to put
> more funds to work and would appreciate your referrals.

52.     Similarly, Turnock signed and disseminated a BPF investor update in July

2011 that stated:

> **Growing our Loan Capacity –** with the rising commercial insurance
> market our loan volume is also increasing.  Since January, our loan
> volume has grown steadily . . . good news as we are putting your dollars to
> work.  I want to make sure our ability to finance business growth keeps
> pace with increasing loan demand.  We are well on our way to reaching
> our new deposit goals, but not yet done.  We appreciate your referrals as
> this has historically been how we have funded our growth.

53.     In meetings with investors at BPF's offices as recently as May 2012,

Turnock said that BPF was "doing great," and that it "had more business than cash."

Turnock also claimed that BPF could pay annual interest rates as high as 12% because it

received annual interest rates exceeding 30% from its insurance premium borrowers.

54.     Each of these representations to investors was false and misleading

because BPF's financial performance and condition had been abysmal since at least 2002

and it had functioned as a Ponzi scheme since that time.

55.     BPF and Turnock also omitted material information regarding BPF's poor

financial performance and condition.  For example, in written correspondence described

herein and in oral conversations with investors, Turnock failed to disclose to investors

that:

a.  BPF had not been profitable in any year from at least 1998 through year-

to-date 2012, but instead, had incurred net losses in each of those years;

b.  Since 2005, even with the exclusion of all BPF overhead expenses, BPF's

revenue was insufficient to meet its interest accruing to investors;

    c.   From January 2011 through at least May 2012, BPF had not generated positive revenue;

    d.   Since 2002, BPF's insurance premium financing business has not generated sufficient positive cash flow in any year with which to make the cash payments it made to investors for redemptions and interest;

    e.   Continuously since 2002, BPF has owed its investors more than it held in total assets.  For example, by 2002, BPF had just over $1.5 million in total assets, but it owed investors more than $2.2 million; and

    f.   As of May 2012, BPF owed investors more than $6.2 million, but it had total assets remaining of less than $500,000.

56.    Turnock also concealed BPF's poor financial performance and condition by repeatedly ignoring investors' requests for BPF's financial statements.  As recently as May 2012, Turnock declined to provide financial statements to an investor on the grounds that BPF was a "private, limited liability company."

57.    BPF's financial performance was material to its investors because the investors relied upon BPF's financial performance to pay their expected investment returns.  BPF's financial condition was material to its investors because the investors relied upon BPF's financial condition to guard against the loss of their investment.

58.    BPF and Turnock each knew, or were reckless in not knowing, that the misrepresentations and omissions to investors described herein regarding BPF's financial performance and condition were materially false and misleading.

### iii. Material Misrepresentations and Omissions Regarding the Safety and Security of the BPF Promissory Note Investment

59.     BPF and Turnock made material misrepresentations and omissions

regarding the safety and security of the promissory note investment, including

characterizing it as "100% protected."  For example, versions of the offering brochure

from approximately 1999 through 2002 stated in relevant part:

MAXIMIZE YOUR INVESTMENTS.  MINIMIZE YOUR RISK.

. . .

HOW SAFE IS MY INVESTMENT WITH BERJAC?

The short answer is:  Your funds are 100% Protected.

That security stems from two things:

- First, premium financing companies, such as Berjac, are protected under the Colorado Insurance Guarantee Fund.

- Second, when we loan funds to finance commercial insurance premiums, the companies are required to pay 25% of the annual premium in advance.  The remaining amount of the policy premium (75%) is paid to Berjac in 8 payments beginning immediately.  By the end of the 9th policy month the Berjac loan is fully repaid.

In the event of non payment, Berjac has Power of Attorney to cancel the policy and is sent the return of "unearned" premium directly from the insurance company – effectively eliminating credit risk to Berjac and our depositors.

. . .

A SAFE, SECURE INVESTMENT.  TOP RATED INSURANCE COMPANIES.

COLORADO INSURANCE GUARANTEE FUND – UP TO $100,000 PER POLICY.

60.     BPF's current promotional brochure disseminated by Turnock states in

relevant part:

How safe is your Bridge loan?

Since the first three month's premium is paid in advance, Bridge's loan is
100% collateralized by the remaining insurance premium.  In the event a
loan payment is 20 days past due, Bridge invokes a power of attorney
which gives the right to assume full policy control of the policy.  Bridge
cancels the policy and receives a full refund of the unused portion of the
annual policy premium.  The amount of the refund covers the outstanding
loan balance.

61.     In addition, BPF brochures referred to an investment in BPF as a "safe . . .

money market account" and the quarterly account statements sent to investors compared

the rates of returns from the BPF notes to money market accounts and certificates of

deposit.

62.     Each of these representations to investors was false and misleading

because the promissory note investment was not safe and secure.  In fact, the collateral

obtained by BPF for its insurance premium financing loans did not provide meaningful

protection to BPF's promissory note investors.  BPF only used a small portion of funds

raised from investors for its insurance premium financing business, and, as a result,

BPF's ability to obtain refunds of unearned premiums on the underlying insurance

policies did not provide meaningful collateral for BPF's promissory note investors.

63.     BPF's loan portfolio as of May 30, 2012, illustrates the limitations of

BPF's collateral.  As of May 30, 2012, BPF's portfolio of insurance premium financing

loans totaled less than $250,000.  Therefore, even if these insurance premium financing

loans were 100% collateralized, they provide collateral for just 4% of the $6.2 million in outstanding BPF investors' liabilities.

64.     Similarly, BPF's references to the Colorado Insurance Guaranty Fund ("CIGF") were false and misleading.  CIGF provides some protections to insurance policyholders and claimants if their insurance company becomes insolvent.  But because BPF used only a small portion of investors' funds to make insurance premium financing loans (which in turn were used to purchase insurance policies), Turnock also knew, or was reckless in not knowing, that CIGF did not provide 100% protection to BPF's promissory note investors.

65.     When making representations about the safety and security of the BPF promissory notes investment, BPF and Turnock failed to disclose to investors that BPF was operating as a Ponzi scheme or that BPF's financial condition and performance was poor and had been deteriorating.

66.     The misrepresentations and omissions regarding the safety and security of the promissory note investment were material to BPF's investors because investors relied upon the safety and security of the promissory notes to guard against the loss of their investments.

67.     BPF and Turnock each knew or were reckless in not knowing that the misrepresentations and omissions to investors described herein regarding the safety and security of the promissory note investment were materially false and misleading.

**D.     Defendants BPF, Turnock and Sullivan Engaged in a Scheme and Fraudulent Practices or Courses of Business to Defraud BPF Promissory Note Investors**

68.     Since at least 2002, Defendants BPF and Turnock engaged in a scheme to defraud BPF investors by, among other things, making Ponzi payments to investors, by making the misleading statements and omissions described herein, and by providing fraudulent quarterly account statements to investors.  Sullivan participated in the scheme beginning in or about February 2011 when he became CFO of BPF.

69.     In furtherance of that scheme, Turnock knowingly or recklessly engaged in numerous practices or courses of business that defrauded BPF investors, including, but not limited to:

　　　　a.   Operating BPF as a Ponzi scheme;

　　　　b.   Making misrepresentations and omissions to investors as alleged herein;

　　　　c.   Authoring, reviewing, and disseminating BPF's false and misleading offering brochures to prospective investors as alleged herein;

　　　　d.   Authoring, reviewing, disseminating, and sometimes signing BPF's false and misleading updates to existing investors as alleged herein;

　　　　e.   Raising additional funds from new and existing investors since 2002 without disclosing BPF's poor financial condition and that BPF was operating as a Ponzi scheme;

　　　　f.   Sending or causing to be sent to investors false and misleading quarterly account statements reflecting principal balances and accrued interest that that BPF could not pay;

    g.  Negotiating so-called "lock letters" with large investors, at increasingly higher interest rates, to convince them to retain their funds with BPF to avoid their requests for redemptions that he knew BPF could not meet;

    h.  Delaying fulfillment of large redemption requests to enable BPF more time to raise funds from other investors to meet the redemptions;

    i.  Working with Sullivan to conceal from existing investors BPF's inability to make timely redemptions, including transferring funds from a new investor to meet a delayed, reduced redemption request of another investor; and

    j.  Misrepresenting to existing investors that redemptions took time because BPF had to retrieve their funds from existing insurance premium financing loans.

70.    As indicated above, Sullivan has been BPF's CFO or *de facto* CFO from approximately February 2011 to the present.  In that capacity, Sullivan has had primary responsibility for, among other things:

    a.  Processing and documenting BPF's daily financial transactions;

    b.  Preparing BPF's quarterly and annual financial statements;

    c.  Maintaining BPF's program tracking all promissory note investments, redemptions, and interest accruals; and

    d.  Generating and causing to be sent to investors BPF's quarterly account statements.

71.    During his employment, Sullivan communicated with BPF investors regarding, among other things, initial investments, redemption requests, and interest accruals.

72.    From approximately February 2011 through the present, Sullivan has, in concert with BPF and Turnock, engaged in a scheme to defraud BPF promissory note investors.  In furtherance of that scheme, Sullivan knowingly or recklessly engaged in numerous practices or courses of business that defrauded BPF investors by, among other things, preparing BPF's financial statements for 2011 and year-to-date 2012 reflecting that BPF was a Ponzi scheme but failing to disclose that material information to investors; distributing fraudulent account statements to investors reflecting millions in account balances and accrued interest that BPF could not pay; concealing from existing investors BPF's difficulty or inability to meet redemptions; and soliciting an investment after BPF's attorney represented to the SEC that BPF had ceased doing so.

73.    By virtue of his accounting for BPF's daily financial transactions and preparation of BPF's financial statements, Sullivan knew or was reckless in not knowing that BPF was functioning as a Ponzi scheme, but failed to disclose to investors in any of his communications with them, that:

    a.    BPF was not profitable;

    b.    BPF's revenue was insufficient to meet its interest accruing to investors;

    c.    From January 2011 through at least May 2012, BPF had not generated any positive revenue;

    d.   BPF's insurance premium financing business did not generate sufficient returns from which to make the payments of redemptions and interest to BPF's investors;

    e.   BPF owed its investors more than it held in total assets.  As of May 2012, BPF owed investors more than $6.2 million, but it had total assets remaining of less than $500,000.

74.    For the last six quarters, including the most recent quarter ended June 30, 2012, Sullivan generated and sent to investors fraudulent account statements reflecting account balances and accrued interest that he knew, or was reckless in not knowing, that BPF could not pay.

75.    Sullivan also knew or was reckless in not knowing that the quarterly account statements that he generated and sent to investors falsely implied that BPF promissory notes were secure because they compared BPF investments to conservative investments such as bank certificates of deposit and money market accounts.

76.    Sullivan also worked in concert with Turnock to conceal from existing investors BPF's difficulty or inability to meet redemptions.  For example, in February 2012, Sullivan knew that Turnock had transferred funds received from significant new investors to meet a delayed, reduced redemption request of another investor.  Yet, Sullivan concealed the Ponzi payments and BPF's poor financial condition in his communications with the new investors and the existing investor.

77.    Sullivan further perpetuated the Ponzi scheme by meeting in person with investors in May 2012 at BPF's offices to assuage their fears about their investments with

BPF.  In that meeting, Sullivan engaged in numerous deceptive acts and courses of dealing.  Specifically, Sullivan:

    a.   Told investors that BPF was "doing well," and that if BPF "had more money, it could make more loans";

    b.   Repeated the general description of BPF's business that had been provided in BPF's offering brochures and by Turnock, that:  (i) BPF used funds from promissory note investors to make insurance premium financing loans; (ii) BPF required borrowers to make a 25% down payment; (iii) BPF's insurance premium financing loans were 100% collateralized, because if borrowers missed a payment, BPF had the power to cancel the underlying insurance policy, and obtain a refund of the unearned premium directly from the insurance company, thereby more than covering the balance of the borrower's loan;

    c.   Showed investors on his computer examples of how BPF's insurance premium loan business purportedly worked, including examples of:  (i) BPF's insurance premium financing loans being made to borrowers; (ii) borrowers making their initial loan down payments; (iii) borrowers making subsequent payments on their loans; and (iv) how the system tracked if borrowers failed to make loan payments, thus enabling BPF to promptly cancel their underlying insurance policy and obtain a partial refund of the premium;

    d.   In response to an investor's question regarding how BPF could afford to pay him 10% or 12% on his promissory note, Sullivan told investors that BPF sometimes made more than 30% annual interest on its insurance premium financing loans, plus certain fees it received from insurance companies; and

    e.   During the meeting, Sullivan failed to disclose any information regarding BPF's poor financial performance and condition, or that BPF was operating as a Ponzi scheme.

78.    Based in part upon reassurances they received in the May 2012 meeting, both investors agreed to retain their funds with BPF, and one of the investors made additional investments.

79.    On or about June 18, 2012, BPF, through its counsel, voluntarily agreed to halt its promissory note offering while the SEC's investigation was pending.

80.    However, in July 2012, with Turnock's apparent approval, Sullivan told an investor that he could make additional investments in BPF by making his investment check payable to Turnock personally instead of to BPF. At the time he solicited this investment, Sullivan knew or was reckless in not knowing that BPF had represented to the SEC that it had ceased soliciting investor funds.

81.    On or about July 20, 2012, in a telephone call with an investor, Sullivan admitted that BPF was operating as a Ponzi scheme. After being notified of the SEC's investigation, the investor had contacted Sullivan by telephone to question him about BPF's operations. During the call, the investor asked Sullivan, "what the heck is going

on?"  Sullivan replied, "I have a lawyer and I shouldn't be talking to you.  But I feel bad because you were just here in May.  Your money is all gone.  This is a Ponzi scheme."

**E.    Defendants Have Profited From the Fraudulent Scheme**

82.    BPF, Turnock, and Sullivan unjustly profited by selling BPF promissory notes in a fraudulent, unregistered offering.

83.    Through May 2012, BPF has raised at least $15.7 million from promissory note investors.  Since 1998, funds raised from promissory note investors has constituted BPF's primary source of cash.  BPF currently is short approximately $5.8 million in investor funds.

84.    Turnock profited from BPF's fraudulent offering by, among other things, collecting cash payments totaling more than $449,000 in the form of management fees and draws, and directing BPF to pay more than $750,000 of his personal expenses.

85.    Sullivan profited from BPF's fraudulent offering by, among other things, collecting an annual salary of approximately $44,000.

**F.    BPF's Promissory Notes Offering Was Not Registered With the SEC or Exempt From Registration**

86.    The definition of a "security" under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 77c(a)(10)]  includes "any note, stock . . . participation in any profit-sharing agreement [or] . . . investment contract."

87.    The BPF promissory notes are securities under the Securities Act and the Exchange Act.  The BPF promissory notes are "notes" and/or "investment contracts" as defined by Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange

Act. The BPF promissory notes are also investment contracts because investors made an investment of money, in a common enterprise, with an expectation of profits to be derived solely from the efforts of BPF.

88. From approximately 1996 through the present, BPF's promissory note offering has raised approximately $15.7 million from more than 120 investors in multiple states.

89. Individual investors sent money to BPF by writing checks to BPF with the expectation of sharing in the net profits from BPF's purported insurance premium financing business activities.

90. Investors expected the profits to come solely from BPF's insurance premium financing activities. The investors were not required or expected to do anything besides provide funds in order to receive their returns.

91. BPF and Turnock offered and sold securities in the form of BPF promissory notes to investors using the means or instruments of interstate commerce including but not limited to telephones, the Internet, and the mails.

92. BPF promissory notes were offered and sold to unaccredited and unsophisticated investors, and neither BPF nor Turnock had a reasonable basis to believe that all BPF investors were accredited and sophisticated.

93. BPF and Turnock failed to provide investors with the information required under Rule 502(b) of Regulation D [17 C.F.R. § 230.502(b)], including an audited balance sheet.

94.     BPF did not have a pre-existing substantive relationship with each investor, and, therefore, engaged in a general solicitation.

95.     BPF's promissory note offering has never been registered with the SEC, or any state securities authority.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities**
**Violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)]**
**(All Defendants)**

96.     Paragraphs 1 through 95 are re-alleged and incorporated herein by reference.

97.     Defendants BPF, Turnock, and Sullivan directly or indirectly, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails:  (a) employed a device, scheme or artifice to defraud with scienter; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

98.     By reason of the foregoing, Defendants BPF, Turnock, and Sullivan violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## SECOND CLAIM FOR RELIEF
### Fraud in the Purchase or Sale of Securities
### Violations of Exchange Act Section 10(b) and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
### (All Defendants)

99.    Paragraphs 1 through 95 are re-alleged and incorporated herein by reference.

100.    Defendants BPF, Turnock, and Sullivan, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of national securities exchange, in connection with the purchase or sale of a security:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

101.    By reason of the foregoing, Defendants BPF, Turnock, and Sullivan violated, and unless enjoined will continue to violate, Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Fraud in the Purchase or Sale of Securities
### Aiding and Abetting Violations of Section 10(b) and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
### (Defendant Sullivan, Alternatively)

102.    Paragraphs 1 through 95 are re-alleged and incorporated herein by reference.

103.    Defendants BPF and Turnock violated Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] by having, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of national securities exchange, in connection with the purchase or sale of a security:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

104.    Defendant Sullivan aided and abetted the violations of Defendants BPF and Turnock by knowingly or recklessly providing substantial assistance.

105.    By reason of the foregoing, Defendant Sullivan aided and abetted violations of, and unless enjoined will continue to aid and abet violations of, Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**Fraud -- Control Person Liability**
**Violations of Exchange Act Section 20(a)**
**[15 U.S.C. § 78t(a)]**
**(Defendant Turnock, Alternatively)**

106.    Paragraphs 1 through 95 are re-alleged and incorporated herein by reference.

107.    Defendant BPF violated Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] by having, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of

a facility of national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

108.    Turnock, as BPF's sole owner and managing member, exercised control over the management, general operations, and policies of BPF, as well as the specific activities upon which BPF's violations are based.

109.    By reason of the foregoing, Defendant Turnock violated, and unless enjoined will continue to violate, Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].

**FIFTH CLAIM FOR RELIEF**
**Sale of Unregistered Securities**
**Violations of Securities Act Sections 5(a) and (c)**
**[15 U.S.C. §§ 77e(a), 77e(c)]**
**(Defendant BPF and Turnock)**

110.    Paragraphs 1 through 95 are re-alleged and incorporated herein by reference.

111.    Defendants BPF and Turnock, directly or indirectly, by use of the means or instrumentalities of interstate commerce or by use of the mails, offered and sold securities or carried or caused such securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale, when no registration statement had been filed or was in effect as to such securities.

112.     By reason of the foregoing, Defendants BPF and Turnock violated, and unless enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## VII.     PRAYER FOR RELIEF

**WHEREFORE**, the SEC respectfully requests that the Court:

### I.

Find that each of the Defendants committed the violations alleged in this Complaint;

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating the laws and rules alleged against them in this Complaint;

### III.

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre-judgment and post-judgment interest, derived from the activities set forth in this Complaint;

### IV.

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]; and

### V.

Grant such other relief as this Court may deem just or appropriate.

## JURY DEMAND

The Commission demands a jury trial in this matter.

DATED:  August 14, 2012

                                        s/Thomas J. Krysa
                                        Thomas J. Krysa
                                        Gregory A. Kasper
                                        Attorneys for Plaintiff
                                        U.S. Securities and Exchange Commission
                                        1801 California Street, Suite 1500
                                        Denver, CO  80202
                                        (303) 844-1000
                                        krysat@sec.gov
                                        kasperg@sec.gov

Of Counsel:
Kurt L. Gottschall