**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:12-cv-02131-JLK-BNB

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

WILLIAM P. SULLIVAN, II,

      Defendant.

---

**ORDER GRANTING DOC. 90, PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Kane, J.

# I.   INTRODUCTION

This matter is part of a civil enforcement action by the Securities and Exchange Commission ("SEC") against Bridge Premium Finance, LLC ("BPF"), Micheal J. Turnock, and William P. Sullivan II.  The claims against BPF and Mr. Turnock were disposed of by consented stipulation after BPF and Mr. Turnock had filed Answers admitting unlawful conduct relating to the Complaint's allegations.  I entered final judgments against BPF and Mr. Tunrock per the stipulation on March 11, 2013.   The SEC moves under Fed.R.Civ.P.56 for summary judgment on all claims alleged against Mr. Sullivan in the Amended Complaint.  As explained below, because no genuine issue exists as to any material fact, summary judgment in favor of the SEC is appropriate as a matter of law in all respects.

# II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the [SEC] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material when it would affect the outcome of the case. *Adamson v. Multi Cmty. Diversified Servs.*, 514 F.3d 1136, 1145 (10th Cir. Kan. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

Mr. Sullivan may survive summary judgment if he can show that a material fact is in dispute by citing to the record or by showing that the materials cited by the SEC "do not establish the absence or presence of a genuine dispute." Fed.R.Civ.P. 56(c)(1); *Anderson*, 477 U.S. at 248. The evidence submitted by the parties is viewed in the light most favorable to the nonmoving party, but Mr. Sullivan is responsible for showing more than a mere "metaphysical doubt" that factual disputes exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). Instead, his assertions "must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

### III. FACTUAL AND PROCEDURAL BACKGROUND

On August 14, 2012, the SEC filed an emergency motion for an *ex parte* temporary restraining order, preliminary injunction, and other emergency relief with a civil complaint alleging that Defendants BPF, Mr. Turnock, and Mr. Sullivan perpetrated a Ponzi scheme through BPF, a business that purported to offer insurance premium financing to the public. I found that the SEC had made a *prima facie* showing that

Defendants violated securities laws and granted a temporary restraining order that froze BPF's assets, prohibited Defendants from accepting investor funds, and temporarily enjoined Defendants from violating the securities laws until the SEC's motion for a preliminary injunction could be heard on the merits. On August 20, 2012, I heard the parties' arguments and granted a preliminary injunction against Defendants that incorporated the terms and conditions of the emergency TRO, including BPF's account freeze.

The SEC submitted an amended complaint on September 19, 2012, adding Jane K. Turnock, Mr. Turnock's former wife, as Relief Defendant. Ms. Turnock was dismissed with prejudice from the case on June 18, 2013. As mentioned above, I have already approved final judgments as to BPF and Mr. Turnock.  The parties' filings that motivated my approval of the final judgments incorporated a set of stipulated facts from Mr. Turnock's related criminal plea in *United States v. Turnock*, 13-cr-00069-CMA (March 4, 2013), which established that Mr. Turnock and BPF were liable for perpetrating a scheme to defraud BPF's note-holders. Final Judgment as to Michael J. Turnock, March 11, 2013, ECF No. 65; Final Judgment as to Bridge Premium Finance, LLC, March 11, 2013, ECF No. 64.

With Mr. Sullivan the only remaining Defendant, the SEC asks me to find Mr. Sullivan liable for primary violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, and § 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), related to the BPF Ponzi scheme. Alternatively, the SEC alleges aiding and abetting violations of

the same, per § 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and § 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

Mr. Sullivan, appearing *pro se*,[1] argues that there are genuine issues of material fact precluding summary judgment. Def.'s Resp. to Pl.'s Mot. Summ. J. 1. His response, however, does not contain any specific legal arguments or cite to the record in support of most of his assertions. After a thorough review of the parties' submitted exhibits, depositions and other evidence, viewed in the light most favorable to Mr. Sullivan, I find that the undisputed[2] facts show the following:

### A.  BPF operated as a Ponzi scheme

Mr. Turnock and BPF purported to offer insurance-related investment opportunities to the public. Ex. 37, Turnock Plea 8. Investors received promissory notes in exchange for cash deposits, which were loaned to small businesses and other individuals seeking insurance premium financing. *Id.* Mr. Turnock guaranteed the investments by assuring note-holders that BPF's clients were charged higher interest rates than those earned on the notes. *Id.* The original amount invested plus any interest earned was redeemable on demand. *Id.* Each quarter, BPF distributed quarterly account statements listing the present interest rate for that quarter and the total balance on each investment.  *Id.* 10-11; Ex. 38, Turnock Dep. 80:4-81:7.  In his criminal plea, Mr.

---

[1] Although "[a] pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers," *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), a litigant's pro se status does not relieve him of the obligation to comply with the federal rules of civil procedure.  Accordingly, I hold Mr. Sullivan's opposition to summary judgment to the summary judgment standard set forth above, neither adding nor distracting from its requirements due to his pro se appearance.

[2] The few disputed facts used to aid the analysis will be noted as such and explained.

Turnock admitted that he started a Ponzi scheme[3] at BPF at about the time the company

began functioning at a loss:

> Beginning no later than 2002 and continuing into 2012, Turnock used most of the money invested by note-holders for purposes other than to make loans to BPF's clients. He used note-holders' money to pay BPF-related expenses, and he also diverted the note-holders' money to fund his other business[and personal expenses.] . . . In addition, he used money from new investments to pay redemptions requested by note-holders who had invested earlier and to make interest payments to earlier note-holders.

*Id.* at 10; *see also* ECF No. 3-2, filed 8/14/2012. By mid-2012, BPF's note-holders had

been defrauded of approximately $6.7 million dollars in connection with the purchase

and sale of promissory notes.[4]

## B.  Mr. Sullivan had knowledge of a fraudulent scheme at BPF by April 2012

In February 2011, Mr. Turnock hired Mr. Sullivan to complete part-time

accounting work as a consultant for several of Mr. Turnock's business entities. Turnock

Dep. 32:12-35:10; Sullivan Dep. 52:5-13. All of Mr. Turnock's entities were closely

related to one another: they were headquartered in the same office building, used the

same Internet server, and maintained accounting records in Quickbooks. Turnock Dep.

30:19-32:4; Bowen Decl., ECF No. 3-2 ¶ 3. By the end of 2011, Mr. Sullivan frequently

reviewed BPF Quickbooks entries for accuracy and edits, helped interview and train new

---

[3]A Ponzi scheme occurs when "[m]oney from the new investors is used directly to repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of new funds." *S.E.C. v. Smart*, 678 F.3d 850, 853 n. 1 (10th Cir. 2012) (citation omitted).

[4] Promissory notes are considered "securities" under the applicable securities laws when they are sold to and purchased by the public as investments and there are no alternative regulatory schemes to protect the investor. *Smart*, 678 F.3d at 857–58 (citation omitted).

BPF employees, "refereed" disputes between BPF's accountants, relayed tasks from Mr. Turnock to BPF employees, and implemented a month-end reconciliation process that required gathering accounting print-outs for all of Mr. Turnock's entities into the "month-end folder." Sullivan Dep. 47:21-49:25, 51:3-22, 53:16-54:19, 54:12-55:17; Declaration of Judy McGuire ("McGuire Decl.") ¶¶ 3-4.

The facts above demonstrate that Mr. Sullivan was closely involved with BPF's operations before 2012. His role as accountant and attendant familiarity with BPF's finances would reasonably allow the inference that Mr. Sullivan knew of or should have known of the fraud at some point before 2012. In any event, Mr. Sullivan himself admits that he knew definitively about the fraud by February 2012 . Sullivan Dep. 104:19-107:24; Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 23 (conceding that he had a "general awareness" of the fraudulent activity by February 2012). Specifically, on or about February 16 Mr. Sullivan overheard Mr. Turnock and BPF's then-CEO discussing the use of a new investor's payment to cover an existing note-holder's redemption because BPF did not have enough money to meet the redemption request. Turnock Dep. 60:19-61:7; Sullivan Dep. 104:19-107:24. Mr. Sullivan understood that BPF intended to use the new investor's payment because the company did not have enough of its own funds to meet the redemption request. *Id.*

Very shortly after overhearing that conversation, Mr. Sullivan's responsibilities at BPF increased. On February 17, 2012, Mr. Turnock granted Mr. Sullivan bank authorization (without signatory authority) to transfer funds between the bank accounts for all of Mr. Turnock's entities. Sullivan Dep. 100:7-101:17.  Mr. Sullivan could also

access all of BPF's bank account records from an online account. *Id.* at 103:10-23. In late March 2012, Mr. Sullivan became CFO at BPF and took over the day-to-day financial operations, including handling deposits and writing checks at Mr. Turnock's direction.[5] Sullivan Dep. 26:5-13, 55:6-11, 62:19-63:10, Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 28. He also trained on FinancePro and Noteholder, the software programs that generated BPF's accounting reports and quarterly account statements, respectively. Sullivan Dep. 63:15-65:14, 60:14-61:20; Ex. 41, Declaration of Mark C. Alexander ("Alexander Decl.") ¶¶ 5-7.

In the first week of April 2012, Mr. Sullivan used Noteholder to print out BPF's quarterly account statements. Sullivan Dep. 63:15-65:14, 60:14-61:20. After seeing the company's balance sheet in Quickbooks, Mr. Sullivan realized that BPF's assets could not cover its $6 million liability to its investors. *Id.* at 113:6-115:3. When he questioned Mr. Turnock about the outstanding liability, Mr. Turnock evaded his inquiries. *Id.* at 115:4-19. Mr. Sullivan therefore requested a meeting with Wendy Campbell, Mr. Turnock's outside CPA. *Id.* He also asserts that he was unable to personally perform an audit on BPF's books and records. Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 41.

Despite his professed concerns and before speaking with Ms. Campbell, Mr. Sullivan nonetheless continued day-to-day operations at BPF as normal. On April 12 and 19, 2012, he accepted two deposits from one of BPF's investors. ECF No. 90-4 (Exhibit

---

[5] In his answer, Mr. Sullivan asserts that he merely "assumed the *title* of CFO" and "continued to earn $20.00/hr., a far cry from what a *true* CFO earns." Def.'s Ans. to Pl.'s Mot. Summ. J. ¶ 27 (emphasis in original). While BPF might very well have paid a bargain wage for Mr. Sullivan's services, the point is without legal or factual significance. The analysis herein places no weight on Mr. Sullivan's title, but rather his close involvement with the day-to-day operations at BPF and demonstrated knowledge that investors were defrauded.

#22); Sullivan Dep. 110:21-111:19. On May 9, 2012, Mr. Turnock asked Mr. Sullivan to meet with investors Ric Harshman and Tryn Hendricks because Mr. Harshman was "concerned." Sullivan Dep. 120:13-121:19. Mr. Turnock "coached" Mr. Sullivan to tell Mr. Harshman that everything was "okay" and "good." *Id.* At the meeting, Mr. Sullivan demonstrated and explained the Finance Pro software, telling Mr. Harshman and Mr. Hendricks that BPF was able to earn the money for investor interest payments and redemptions by charging its insurance premium clients high interest rates. *Id.* at 121:24-122:7; ECF No. 3-4, Harshman Declaration, ¶¶ 13-14; ECF No. 3-3, Hendricks Declaration, ¶¶ 12-13. Mr. Turnock also coached Sullivan to tell the investors that BPF was "doing well," and to encourage their continued investment by saying that if BPF "had more money, it could make more loans." Sullivan Dep. 120:13-124:4; Pl.'s Br. Emer. Mot. TRO Aug. 18, 2012, ECF No. 34; Harshman Decl. ¶¶ 13-14; Hendricks Decl. ¶¶ 12-13. Mr. Sullivan's routine operations appear to have continued until at least July 2, 2012, when he printed out the second quarter investor account statements for BPF's investors. Ex. 41, Alexander Decl., ¶¶ 10-11.

The SEC began its investigation into BPF on May 18th, 2012. Mr. Sullivan had not yet had his meeting with Ms. Campbell, but was aware of the investigation because Mr. Turnock's attorney instructed him to produce documents for the SEC. Sullivan Dep. 118:7-9, 117:22-118:6. When Mr. Sullivan finally met with Ms. Campbell, he told her that "this is my first exposure" and that "I don't want to touch this thing." Sullivan Dep. 115:9-19. Ms. Campbell responded that she was "scared" and that Mr. Turnock had "blown through like a million dollars from some other entity." Sullivan Dep. 115:20-

116:24. This meeting occurred sometime in late May and Mr. Sullivan informed Mr. Turnock afterward that he had a "serious problem" on his hands. *Id.* at 116:25-117:14. Notwithstanding these revelations, Mr. Sullivan continued working with Mr. Turnock at BPF.

In June 2012, he helped Mr. Turnock convert the money in his bank accounts into cash. He knew that Mr. Turnock wanted to clean out his accounts because of the ongoing SEC investigation. Def.'s Resp. ¶ 51. On June 8th, 2012, Mr. Turnock wrote Mr. Sullivan a check for $15,000, which Mr. Sullivan then deposited and withdrew as cash for Mr. Turnock's use. Sullivan Dep. 133:5-135:16; Ex. 25, BellCo Credit Union Check No. 2082; Ex. 26, JPMChase01403-04, Deposit Ticket (June 8, 2012); JPMChase01396-97 (account transaction record).

Mr. Sullivan also accepted payments from Mr. Turnock and his entities in June 2012. On June 8, 2012, Mr. Sullivan accepted a check for $5,000, but he could not remember the reason for the check during his deposition. Sullivan Dep. 132:12-133:1. On June 15, 2012, Mr. Sullivan received a $15,000 bonus from Mr. Turnock, which Mr. Sullivan represents was a reward for his hard work.[6] Sullivan Dep. 136:1-137:6, 142:5-19; Ex. 26, JPMChase01397 (account transaction record); Ex. 27, Check No. 10125 (check for $24,949.65 from BPF to Delphi Companies, LLC, with subject line "William Sullivan Bonus"). On June 28, 2012, Mr. Turnock loaned Mr. Sullivan $10,000 from a

---

[6] Mr. Turnock denies ever giving Mr. Sullivan a bonus, and in his deposition states that he did not endorse the $15,000 check. Turnock Dep. 69:1-5, 71:11-14. However, this dispute of fact is immaterial. This payment is relevant not because of *who* wrote the check, but because of Mr. Sullivan's acceptance of funds from Mr. Turnock or any of his entities despite knowing of his fraudulent conduct.

Turnock Companies, LLC, bank account, which Mr. Turnock ultimately forgave in full. Sullivan Dep. 139:14-140:7; Ex. 26, JPMChase01407, Check No. 10068.

Additionally, Mr. Sullivan used funds from Mr. Turnock to establish a new business. On July 6, 2012, he opened a Chase bank account jointly with Mr. Turnock for their entity, MTSB, LLC. Ex. 29 (bank records); Sullivan Dep. 146:7-148:9. The two planned for Mr. Sullivan to obtain his insurance brokerage license and to start an insurance brokerage firm. Sullivan Dep. 146:15-147:2. Mr. Turnock funded the bank account with three deposits of approximately $25,000 between July 6 and July 23, 2012. Ex. 29. Mr. Turnock also wrote multiple checks between July 13 and July 30, 2014, that were used to pay Mr. Sullivan's attorney and legal fees. Sullivan Dep. 142:20-146:5; Ex. 28 FirstBank_00632, 00634, 00636, 00637. These checks were all drawn on BPF accounts. *See id.*

By mid-July, the SEC, still actively investigating BPF, had directed Mr. Turnock and Mr. Sullivan not to accept additional funds from investors. Ex. 23; Ex. 38, Turnock Dep., p. 73:2-21. Around July 16, 2012, Mr. Harshman sent a $14,000 check to BPF as part of a planned monthly addition to his investment. Mr. Turnock returned the check, neglecting to explain about the SEC investiagion and falsely stating that BPF could not accept any new deposits at the time because Mr. Sullivan was auditing BPF's accounts. Dkt. 3-4, Harshman Decl., ¶ 19. Mr. Harshman then called Mr. Sullivan to point out that the terms of his agreement required BPF to accept his monthly deposits and pay him 12% interest. Pl.'s Br. Emer. Mot. TRO Aug. 18, 2012, ECF No. 34, Harshman Decl. ¶ 20. Mr. Sullivan suggested that Mr. Harshman write a check for $28,000, a sum that would

cover both his June and July investments, and make it payable to Turnock Companies, LLC, instead of to BPF.[7] Sullivan Dep. 128:11-129:11. On July 20, 2012, the SEC interviewed Mr. Harshman as part of the investigation into BPF, and Mr. Harshman immediately tried to contact Mr. Turnock and Mr. Sullivan. Harshman Decl., ¶ 21. Later that day, he spoke with Mr. Sullivan who said, "Your money is all gone. This is a Ponzi scheme." ECF No. 3-4, Harshman Decl., ¶ 21; *see also* Sullivan Dep. 129:15-130:14.

On July 23, 2012, Mr. Sullivan resigned from his position as CFO at BPF, but continued working for three of Mr. Turnock's other entities. Ex. 24; Sullivan Dep. 130:16-131:12. On August 14, 2012, the SEC filed this complaint and was granted a temporary restraining order that froze all of BPF's assets, effectively ending the Ponzi scheme. Ex. 37, Turnock Plea 12. After BPF shut down, Mr. Sullivan requested and received a letter from Mr. Turnock stating that he was not involved in the fraud at BPF. Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 49 ("Sullivan admits to requesting a letter from Turnock exonerating him from any involvement in the fraud for which Turnock had been charged and subsequently sentenced."). The letter reads:

> Dear Bill:
> I am very sorry that you have been brought into the SEC investigation of Bridge Premium Finance. You should not

---

[7] Mr. Sullivan and Mr. Turnock give conflicting accounts regarding who hatched this alternative plan. Mr. Sullivan stated in his deposition that the acceptance of additional deposits was "a Mike issue" (referring to Mr. Turnock) and that Mr. Turnock directed him to tell Mr. Harshman to make his check payable to Turnock Companies and that Mr. Turnock would "give him the same deal." Sullivan Dep. 128:2-129:14. Mr. Turnock's testimony is that Mr. Sullivan came up with the idea to circumvent the SEC order by accepting Mr. Harshman's check as a Turnock Company investment. Turnock Dep. 74:11-22. He also claims that he never directed or authorized Mr. Sullivan to relay that to Mr. Harshman, but was "specifically told no." *Id.* at 74:23-75:9. Either way, no matter whose idea it was, Mr. Sullivan presented the workaround to Mr. Harshman. Even crediting Mr. Sullivan's testimony, Mr. Sullivan cannot avoid liability by claiming that he was merely following a supervisor's orders given that he undisputedly had knowledge of the SEC investigation and alleged fraud, and thus his conduct was at minimum reckless.

have been. Your involvement with me started with simple project work on COREplus Insurance and Delphi Companies. As the complexity of the Delphi start up increased I asked you to devote more hours, but it remained as a part time and none of your projects involved Bridge in any manner. You had nothing at all to do with Bridge until Tina Weber was terminated in late March. The most pressing need caused by her unplanned departure was to process Bridge business. She was the only one who knew how to provide quotes to agents, process payments, and enter new business. You agreed to figure out by yourself how to process day to day business; process that took several weeks and had nothing to do with Bridge financials. It was not until late April that you began to get involved in book keeping activities for Bridge. I never asked you to project cash flow or prepare financial statements. So, I find it very difficult to understand why you can be held accountable for something in which you had no knowledge of or involvement in. Bill, I hope that the SEC will soon agree to their satisfaction that you should not be included in this action.
Sincerely,
Michael J. Turnock

Ex. A to Def.'s Resp. to Pl.'s Mot. Summ. J. Mr. Turnock recanted this position during his deposition on June 27, 2013, purportedly after realizing that Mr. Sullivan "knew long before March, late March, that there were problems at Bridge and had ample opportunity to say 'I don't want to be a part of this' and [he] never -- never took that step." Turnock Dep. 77:6-10. This deposition followed Mr. Turnock's criminal plea and civil settlement with the SEC, as well as my rejection of Mr. Sullivan's consent decree and proposed final judgment.

In his Response, Mr. Sullivan opines of Mr. Turnock's *volte-face* that "the motivation behind such actions, [sic] is unclear but assumptions can be made." Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 49. Later in his brief, he seems to suggest that the

assumption he alluded to is the possibility that a judgment against him would allow the SEC to "double dip" and force him to pay a portion of the fines already levied against Mr. Turnock. Citing the $4 million restitution that Mr. Turnock must pay per his *criminal* plea, Mr. Sullivan argues that the SEC, in this *civil* enforcement action, "stands to benefit ('double-dipping') by securing Judgment against Sullivan for the same monies." Def.'s Resp. to Pl.'s Mot. Summ. J. 11.  This is an unfounded fear because the SEC's Motion only requests summary judgment as to Mr. Sullivan's liability under the antifraud provisions of the securities laws. Any disgorgement or civil penalties that the SEC chooses to pursue against Mr. Sullivan would be related solely to his individual liability and in any event are not currently being sought.

Therefore, I find no evidence (and Mr. Sullivan presents none) that demonstrates Mr. Turnock changed his tune in bad faith. Mr. Sullivan himself contradicts the letter's contents. He admits that he knew of the fraud and completed day-to-day tasks for BPF in direct contravention of the letter's assertion that Mr. Sullivan shouldn't be "held accountable for something in which [he] had no knowledge of or involvement in." Ex. A to Def.'s Resp. to Pl.'s Mot. Summ. J. Mr. Sullivan admits that he asked Mr. Turnock to write the letter for purposes of exonerating him from the scheme, Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 49, and the letter's formal tone hints that it was written specifically to address legal elements of securities fraud.  A reasonable jury would be hard-pressed to find any sincerity in its contents when juxtaposed with earlier casual correspondence between Mr. Turnock and Mr. Sullivan. *See* Ex.'s 14, 19. In conclusion, the undisputed

facts establish that Mr. Sullivan knew of the scheme at BPF *at least* by April of 2012, but continued to act in furtherance of BPF's operations.

## IV. DISCUSSION

## PRIMARY VIOLATIONS OF §17(a) AND RULE 10B-5: SCHEME LIABILITY

The SEC argues Mr. Sullivan's liability under a theory of "scheme liability" per § 17(a)(1) and (3) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and § 10(b) Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), promulgated under Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5. Pl.'s Mot. Summ. J. 12–14; Am. Comp. 30–32. Section 17(a) prohibits the use of interstate commerce for fraudulent or deceitful purposes:

> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c (a)(78) [1] of this title) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—
> (1) to employ any device, scheme, or artifice to defraud, or . . .
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. §77q(a)(1), (3). Similarly, § 10(b) prohibits the use of manipulative and deceptive devices:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as

14

> the Commission may prescribe as necessary or appropriate in
> the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Promulgated under § 10(b), Rule 10b-5 prohibits the employment of

manipulative and deceptive devices, and is substantially similar to § 17(a):

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any national
> securities exchange,
> (a) To employ any device, scheme, or artifice to defraud, [or]
> . . .
> (c) To engage in any act, practice, or course of business
> which operates or would operate as a fraud or deceit upon any
> person, in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5(a), (c).

There is only one difference between claims made under these two sections: the

SEC must establish scienter for claims per §§ 17(a)(1) and 10(b), but simple negligence

is sufficient to satisfy the requirements of § 17(a)(3). *Aaron v. SEC*, 446 U.S. 680, 696

(1980).

To prove scheme liability under §17(a)(1) and (3) and Rule 10b-5(a) and (c),[8] the

SEC must show by a preponderance of the evidence that Mr. Sullivan (1) committed a

manipulative or deceptive act, (2) in furtherance of the scheme to defraud, (3) with

---

[8] When alleged contemporaneously by the SEC, courts generally treat these provisions as having the same
scope and analysis under the scheme liability framework. *See, e.g.*, *St. Anselm*, 936 F.Supp.2d at 1298-99.
Thus, this analysis proceeds as if § 17(a)(1) and (3) and Rule 10b-5(a) and (c) are indistinguishable.

scienter. *SEC v. St. Anselm Exploration Co.*, 936 F. Supp. 2d 1281, 1298 (D. Colo. 2013) (citation omitted).[9]

For conduct to be a "manipulative or deceptive act," it must be "inherently deceptive when performed." *St. Anselm*, 936 F.Supp.2d at 1299 (quoting *SEC v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011)). In other words, Mr. Sullivan must have participated in an "illegitimate, sham, or inherently deceptive transaction where [his] conduct or role has the purpose and effect of creating a false appearance." *Id.* (citing *SEC v. Lucent Technologies, Inc.*, 610 F.Supp.2d 342, 360 (D.N.J. 2009)) (other citations omitted). A majority of the circuits and several district courts in the Tenth Circuit have drawn a "bright line" between the types of conduct that satisfy claims made under the scheme liability framework and claims that a defendant made material omissions or misstatements actionable under § 17(a)(2) or Rule 10b-5(b). *See St. Anselm*, 936 F.Supp.2d at 1299; *SEC v. Goldstone*, 952 F. Supp.2d 1060, 1203 (D.N.M. 2013) ("The Second, Eighth, and Ninth Circuits have held that scheme liability encompasses only actions which include deceptive conduct beyond assistance with a material misstatement or omission.") (citations omitted). Thus, to succeed on the present theory, the SEC must prove that Mr. Sullivan committed deceptive acts beyond making fraudulent statements to investors. While such material misstatements or omissions might create liability under other theories, scheme liability requires deceptive conduct *in addition to*

---

[9] Alternatively, under §17(a)(3), "the SEC must demonstrate that [Sullivan] (1) engaged in acts, practices, or courses of dealing which operate as a fraud or deceit; (2) in the offer or sale of securities; (3) using interstate commerce or the mails; and (4) negligence." *SEC v. St. Anselm Exploration Co.*, 936 F. Supp. 2d 1281, 1298 (D. Colo. 2013) (quoting *Aaron*, 446 U.S. at 646).

misrepresentations. *See Goldstone*, 952 F.Supp.2d at 1203-04. This requirement maintains the distinction between conduct that is sufficient to satisfy the two different theories of primary liability under the antifraud provisions, thus preventing the SEC from "double-dipping" and alleging the same conduct as proof of two separate violations of the securities laws. *See St. Anselm*, 936 F.Supp.2d at 1299.

This does not mean, however, that fraudulent statements may never be used to demonstrate a secondary actor's scheme liability. *Goldstone*, 952 F.Supp.2d at 1206 ("[S]cheme liability does not preclude, outright, claims based upon a scheme to misrepresent or omit material facts.") (citation omitted). Instead, to be "inherently deceptive," a misstatement or omission must also be accompanied by some underlying fraudulent transaction. *See Lucent*, 610 F.Supp.2d at 360–61. In *Lucent*, the court dismissed a scheme liability claim made by the SEC against defendants involved in the legitimate sale of telecommunications equipment. Although the defendants made deceptive statements to investors about the rights of return and pricing concessions they would receive, the underlying sales were legitimate business transactions, so the deception was not "inherent." *Id.* at 360. Instead, only the defendants' failure to disclose the "real terms" of the transaction was deceptive, thus the defendants could only be held liable under Rule 10b-5(b)'s prohibition on making material misstatements or omissions. *Id.*

### A. Mr. Sullivan committed deceptive acts in furtherance of the Ponzi scheme to defraud investors at BPF.

The SEC asserts that Mr. Sullivan committed six deceptive acts in furtherance of the BPF Ponzi scheme: (1) taking personal payments from Mr. Turnock up until August 2012, (2) helping Mr. Turnock "clean out" his bank accounts during the SEC investigation, (3) soliciting an investment, (4) receiving an investor's deposit, (5) generating false quarterly reports for investors on two occasions, and (6) making false and misleading statements to two investors. *See* Pl.'s Mot. Summ. J. 1.

Two of the SEC's alleged acts fail to satisfy the requirements of scheme liability. (1) Accepting payments from Mr. Turnock and (2) helping him "clean out" his bank accounts during the SEC investigation were not done "in furtherance of" the Ponzi scheme at BPF. Although circumventing an SEC investigation and personally benefitting from the profits of a fraudulent scheme are dishonest actions, neither act clearly contributed to the operation of the underlying fraud. Therefore, I proceed with the analysis of the SEC's remaining allegations: that Mr. Sullivan (3) solicited further payments from existing note-holders, (4) accepted investment deposits in furtherance of the BPF Ponzi scheme, (5) generated false reports, and (6) made false and misleading statements to Mr. Harshman and Mr. Hendricks.

Even viewed most favorably to Mr. Sullivan, the evidence shows that he did more than merely make an omission or representation to Mr. Harshman and Mr. Hendricks about the financial condition of BPF. Instead, he solicited investments in furtherance of the Ponzi scheme by insinuating that "more money" would allow BPF to "make more loans," thus leading to higher investor pay-outs. Sullivan Dep. 120:13-124:4. This act was also inherently deceptive: the underlying transaction was not a legitimate sale of

promissory notes, unlike the true sales of telecommunications equipment in *Lucent*. Instead, BPF note-holders' payments were being diverted to pay other investors and to cover Mr. Turnock's business and personal expenses. Mr. Sullivan's statements and software demonstration were clearly intended to mislead the investors and to assure Mr. Harshman and Mr. Hendricks that their money was being used legitimately, and undisputedly "ha[d] the purpose and effect of creating a false appearance." *Goldstone*, 952 F.Supp.2d at 1235. The same can be said about Mr. Sullivan's generation of the false investor reports. By using the Noteholder software to print out quarterly statements for investors, Mr. Sullivan was completing an act to further an underlying fraudulent transaction. The account statements provided to investors listed interest rates and account values based on transactions for insurance premium financing loans that did not actually occur. Thus, making these omissions and misstatements was the type of "inherently deceptive" conduct sufficient for scheme liability. *See St. Anselm*, 936 F.Supp.2d at 1299; *Goldstone*, 952 F.Supp.2d at 1204-05.

Mr. Sullivan also acted in furtherance of the scheme by accepting and processing, or attempting to accept, deposits from BPF's investors on three occasions. On April 12 and 19, 2012, Mr. Sullivan accepted two deposits into BPF's bank account. Ex. 22; Sullivan Dep., 110:21-111:19. Next, Mr. Sullivan attempted to accept an investment payment from Mr. Harshman on July 19, 2012. Sullivan Dep. 128:11-129:11. Because BPF had been instructed by the SEC to stop accepting deposits, Mr. Sullivan suggested that Mr. Harshman make the check out to Turnock Companies instead of BPF. As previously discussed, these deposits were not just routine tasks done in support of a

legitimate business transaction. Instead, Mr. Sullivan's conduct created the false appearance that the deposits would be used to fund insurance premium loans, when in reality they were entered into a Ponzi scheme. Thus, the SEC has sufficiently shown evidence to prove Mr. Sullivan's deceptive conduct.

### B. Mr. Sullivan acted with the requisite scienter because he knew of or was at least reckless toward the knowledge of a fraudulent scheme at BPF by April 2012.

To prove scienter, the SEC must demonstrate that Mr. Sullivan acted intentionally, knowingly, or recklessly. *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1113 (D. Colo. 2002) (citations omitted). Recklessness is defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Phil. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (citation omitted). It necessarily follows that Mr. Sullivan could only have acted with the requisite scienter if he knew or clearly should have known about the Ponzi scheme at BPF before committing the deceptive acts discussed above. "Fundamentally, both § 17(a) and § 10(b) are designed to protect investors from fraudulent practices." *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) (quotation marks and citation omitted).

The undisputed facts demonstrate that he conclusively knew of the following in early April 2012: (1) that new investments had been used to cover existing note-holder redemptions; and (2) that BPF had more than $6 million in liabilities, which greatly exceeded its assets. Specifically, Mr. Sullivan admits that he learned about BPF's $6 million liability to investors during the first week of April 2012 when he generated

investor account statements for the first quarter, making him "aware of the possible fraud." Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 20; *see also id.* ¶ 32. Mr. Sullivan also admits that, two months before learning about this deficit, he possessed a "general awareness that new investor funds were used to cover another investor's redemption request." Pl.'s Mot. Summ. J. ¶ 24; Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 24. Despite this knowledge, Mr. Sullivan continued to complete tasks in support of BPF's operations by accepting deposits and meeting with investors to solicit further funds. This inherently deceptive conduct coincided with his knowledge of the underlying fraudulent scheme, meaning that Mr. Sullivan possessed the requisite level of scienter.

Mr. Sullivan's repeated admissions prove that he knew of the ongoing scheme to defraud investors at BPF in April 2012, thus inculpating his earlier deceptive conduct between April and July 2012. Even if a jury could find that Mr. Sullivan only had a "general awareness" of "possible fraud" at BPF by April 2012, his deceptive conduct toward investors between April and July (accepting deposits, demonstrating BPF's financial software, attempting to circumvent the SEC's investigation, etc.) was so obviously misleading as to be an "extreme departure from the standards of ordinary care." *Fleming*, 264 F.3d at 1258.

### C. Mr. Sullivan fails to rebut the SEC's allegation of scienter.

To rebut the SEC's allegations of scienter, Mr. Sullivan asserts two justifications for acting in furtherance of BPF's operations despite knowing that investors were being defrauded: (1) that he did not possess enough knowledge and acted in good faith, and (2) that he acted purely at the direction of Mr. Turnock.

To argue lack of knowledge, Mr. Sullivan asserts that he "was overwhelmed with the information he recently inherited and, not having had an opportunity to do an audit . . .relied, to his detriment, on information and instruction of Turnock." Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 41. After learning of the $6 million liability in April, he merely continued "working on the day-to-day posting payments and whatnot." Sullivan Dep. 118:1–4. He "had no reason to believe he was acting in bad faith or irresponsibly" because he "was not aware … that enough evidence existed to criminally charge Turnock." Def.'s Resp. to Pl.'s Mot. Summ. J. 3.

Whether Mr. Sullivan possessed the requisite scienter turns on whether he knew of the fraud at BPF and acted deceptively to further the scheme with intent, knowledge, or recklessness. *See Fleming*, 264 F.3d at 1258. It does not turn on whether Mr. Turnock was guilty of criminal securities fraud. Although Mr. Sullivan does not possess an accounting degree or hold the registration requirements required to be a CPA, Sullivan Dep. 8:23-10:17, his extensive work history as an accountant, *see id.* at 18:6-23:20, and familiarity with Generally Accepted Accounting Principles (GAAP), *see* Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 16, indicate that he should have been aware of proper, lawful accounting practices. These facts alone refute any claim that he conducted himself with good faith.

Accepting investor deposits and soliciting further payments with knowledge that those deposits were not actually being used to purchase securities goes beyond reckless and demonstrates an intent to defraud. *See Smart*, 678 F.3d at 857. An accountant who becomes "overwhelmed" by the revelation that his employer is operating a scheme to

defraud investors and is indebted for millions of dollars would not, under the standards of ordinary care, continue on with business as usual as if nothing were amiss. To my knowledge, no precedent exists allowing an individual to play ostrich until he has the opportunity to complete a personal audit or until he learns whether his boss has been criminally charged.

To argue that he lacked the requisite level of scienter, Mr. Sullivan points to the fact that Mr. Turnock "coached" him before meeting with Mr. Harshman and Mr. Hendricks and directed him to process deposits and carry on as normal. Mr. Sullivan asserts that he "was concerned he would lose his employment and at this point did not possess enough information to question Turnock's motivation." Def.'s Resp. to Pl.'s Mot. Summ. J. ¶ 38. These arguments are unfounded. First, I have already established that Mr. Sullivan did have enough information to question Mr. Turnock's motivation.  Indeed, he specifically admits to questioning Mr. Turnock's motivation. He testified that he asked Mr. Turnock, "how can this be?" and "where is the money?" Ex. 39, Sullivan Dep., p. 115:4-19. His request for a meeting with Ms. Campbell also illustrates his unease about BPF's operations.  Second, the relationship between Mr. Turnock and Mr. Sullivan could not reasonably be construed as that of a tyrant and his lackey. The evidence instead tends to show that Mr. Turnock delegated authority to Mr. Sullivan, asking him to relay messages to BPF employees and instructing them to take his direction. *See* Exs. 16, 17. It appears that they were friendly: Mr. Sullivan helped Mr. Turnock circumvent the SEC by cashing checks for him, and the two men were planning to go into the insurance brokerage business together as MTBS, LLC. Sullivan Dep. 146:15-147:11. Thus, despite

Mr. Sullivan's unsupported assertions, nothing on the record indicates that any type of employment relationship caused Mr. Sullivan to lack the requisite scienter.

### V.   CONCLUSION

In sum, the undisputed facts demonstrate that Mr. Sullivan committed primary violations of § 17(a) and Rule 10b-5 because he at least recklessly committed inherently deceptive acts in furtherance of the Ponzi scheme at BPF. Analysis of whether Mr. Sullivan committed aiding and abetting violations is therefore unnecessary. The SEC's Motion for Summary Judgment as to Mr. Sullivan's primary liability for the allegations set forth above is GRANTED.

DATED:      September 19, 2014              BY THE COURT:

*s/John L. Kane*
John L. Kane, U.S. Senior District Judge